UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

| | |
|---|---|
| HOOVER AUTOMOTIVE, LLC d/b/a HOOVER DODGE CHRYSLER JEEP OF SUMMERVILLE, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>CDK GLOBAL, LLC and THE REYNOLDS AND REYNOLDS COMPANY,<br><br>       Defendants. | Case No. 17-cv-864_<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## I.       INTRODUCTION

1.       Plaintiff Hoover Automotive, LLC d/b/a Hoover Dodge Chrysler Jeep of Summerville ("Plaintiff"), brings this Class Action Complaint on behalf of itself and on behalf of direct purchasers ("Class Members") of Dealer Management System Software ("DMS") from Defendants CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds") during the period January 1, 2015, to the present ("Class Period").  CDK and Reynolds are referred to herein as "Defendants."

2.       Defendants sell their proprietary DMS to car dealerships throughout the United States. Collectively, Defendants control approximately 75% of the DMS market by number of licensed dealers and approximately 95% of the DMS market by cars sold. Defendants have used their market dominance to lock dealers into long term contracts at inflated prices.

3.       In addition to DMS, Defendants also provide Dealer Data Integration Services ("DDI") to car dealerships and their respective third party vendors. DDI enables dealers and

third-party vendors to extract and integrate the dealership owned data into a usable format. Defendants maintain a monopoly for DDI which allows Defendants to control which vendors can access dealership data that is stored on either CDK's or Reynolds' systems.

4.      Defendants allegedly conspired to divide markets, cease competing, and raise prices at which integration services to dealerships and application vendors are sold. Defendants' collusive activity includes blocking competitors from accessing data stored on any CDK or Reynolds DMS, and entering into an agreement in 2015 to cease competing for integration services, divide the integration service market, and block competitors from accessing data on the CDK and Reynolds DMS. Defendants also unlawfully tie the provision of DDI services to the supply of DMS which leaves Dealers little choice but to utilize the Defendants' DDI services.

5.      Plaintiff seeks to recover damages incurred by itself and Class Members due to Defendants' overarching scheme to divide markets, suppress competition and artificially inflate prices of DMS through unlawful agreements and unlawful tying the provision of DDI services to the purchase of DMS.

6.      As a result of Defendants' anticompetitive scheme, Plaintiff and Class Members paid more for DMS and DDI services than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As set forth below, Defendants' scheme violates the federal antitrust laws and, in particular, Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act").

7.      Plaintiff makes the allegations herein based on personal knowledge and investigation of these matters relating to itself and upon information and belief as to all other matters.

## II.     NATURE OF THE CASE

8.     Defendants have unlawfully colluded to restrain and/or eliminate competition by engaging in an anticompetitive conspiracy designed to foreclose competition in the market for DMS in the United States, in violation of Section 1 of the Sherman Act.  This misconduct enabled Defendants to overcharge direct purchasers for DMS and illegally tie their DDI to their DMS.

9.     Defendants engaged in an overarching scheme to fix the price of DMS and DDI services.   Beginning on or about February 1, 2015, Defendants entered anticompetitive agreements to artificially inflate prices and maximize profits.  Defendants deprived direct purchasers of a competitive market for either DMS or DDI services.

10.     Plaintiff, on behalf of itself and Class Members, seeks redress for the overcharge damages sustained as a result of Defendants' unlawful conspiracy and other anticompetitive conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  But for Defendants' illegal conduct, Plaintiff and Class Members would not have paid supracompetitive prices for DMS and DDI services.

## III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

12.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period, the Defendants transacted business in the United States, including in this District.

13.     During the Class Period, Defendants sold DMS and DDI services in a continuous and uninterrupted flow of interstate commerce, which included sales of DMS in the United States, including in this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

14.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and marketing of DMS and DDI services throughout the United States, including in this District; (c) had and maintained substantial contacts with the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for DMS and DDI services that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

15.     Venue is proper in this District and personal jurisdiction exists in this District because the Defendant's activities within the forum are and have been continuous and systematic; the Defendant license, advertise, and sell products and services within the District; the Defendants' employees and agents have traveled to and conducted business in the District.

## IV.     THE PARTIES

### A.     PLAINTIFF

16.     Plaintiff Hoover Automotive, LLC d/b/a Hoover Dodge Chrysler Jeep of Summerville ("Hoover Automotive") is a limited liability company organized under the laws of the State of South Carolina, with its principal place of business located at 195 Marymeade Drive, Summerville, South Carolina 29483.  During the Class Period, Hoover Automotive purchased DMS directly from Defendant Reynolds and was injured by the illegal conduct described herein.

As a result of Defendants' anticompetitive conduct, Hoover Automotive paid supracompetitive prices for DMS, and Hoover Automotive was injured by the illegal conduct alleged herein.

### B.    DEFENDANTS

17.    Defendant CDK Global, LLC ("CDK") is a Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois, 60169. In 2014, CDK was spun off from ADP, LLC and is now and independent, publicly traded company in which ADP retains no ownership interest. Prior to the spin-off from ADP, LLC, CDK was referred to as ADP Dealer Services.  During the Class Period, CDK marketed and sold and continues to market and sell its proprietary DMS software and services to automobile dealerships in this District and throughout the United States.

18.    Defendant The Reynolds and Reynolds Company ("Reynolds") is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45340.  Reynolds was formerly a publicly traded company but was privately acquired in 2006.  During the Class Period, Reynolds marketed and sold and continues to market and sell its proprietary DMS software and services in this District and throughout the United States.

19.    Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs.

### V.    UNIDENTIFIED CO-CONSPIRATORS

20.    Various other persons, firms, entities and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged

herein, and have aided, abetted and performed acts and made statements in furtherance of the conspiracy.

21.    The true names and capacities, whether individual, corporate, associate or representative, is unknown to Plaintiff at this time.  Plaintiff may amend this Complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

22.    At all relevant times, other persons, firms and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful monopolization as described herein.

23.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators or were ordered or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction or control of its affairs.

## VI.    FACTUAL ALLEGATIONS

### A.    Dealer Management System Software

24.    Defendants each own proprietary DMS, which is mission-critical enterprise software utilized by retail automotive dealerships in the U.S. and it is critical to dealer operations.[1] DMS operates as a database where a dealer enters its data, including data on inventory, customers, sales, service information, manufacturer pricing and rebate information, vehicle financing and insurance information.  Further, DMS software handles and integrates the critical business functions of a dealership, including sales, financing, inventory management for vehicles and parts, repair and service, accounting, payroll, human resources, marketing, and

---

[1] Retail automotive dealerships are sometimes referred to herein as "dealers."

more. DMS has been described as "one of the highest cost objects in a dealership, but it is also the center of a dealer's entire retail management platform. It's impossible to operate without it."[2]

25.    Physical storage of a dealer's data typically takes place either onsite at the dealership on servers owned by the dealer or the DMS provider, offsite at private data centers operated by the DMS provider, or with cloud-based data storage companies.

26.    A dealer can only utilize one DMS provider at a time, because different DMS providers have their own distinct and proprietary operating software for their respective systems.

27.    DMS providers license and sell their software and services to dealers pursuant to written contracts of between five and seven years in length.

28.    Both CDK and Reynolds have fee escalation clauses in their DMS contracts with dealers. The standard Reynolds contract provides that DMS fees go up every year on March 1. The price increase is therefore automatic, and is measured by the Customer Price Index plus 2%. The standard CDK contract gives dealers price protection for the first year of the DMS contract, but imposes a 6% automatic yearly price increase thereafter.

**B.    Defendants Dominate the DMS Market**.

29.    CDK and Reynolds dominate the DMS market. Combined, CDK and Reynolds control approximately 75 percent of the DMS market in the United States when measured using franchised stores, with CDK controlling approximately 45 percent of the market and Reynolds controlling approximately 30 percent. When measured using the number of vehicles sold from franchised dealers, CDK's and Reynolds' combined market share exceeds 90 percent. CDK's and Reynolds' domination, or duopoly, of the DMS market in the U.S. has been stable for decades.

---

[2] *See* Gillrie Institute, "5 Dealership Technology Projects for 2016," available at http://paulgillrie.com/5-dealership-technology-projects-for-2016/.

30.     CDK and Reynolds reap enormous profits.  A single, small dealership will pay up to $150,000 per year for DMS software license and services. Mid-size dealership groups of 5 to 10 stores can pay $1,500,000 or more per year, and large dealerships can easily pay over $5,000,000 per year.  CDK's market capitalization is $9.2 billion.

31.     Barriers to entry to the DMS market are high. Microsoft Corp. tried to enter the DMS market in 2006 but failed. In trying to take on CDK and Reynolds, a Microsoft executive publicly conceded, "We kind of got ahead of ourselves."[3] Reynolds Chairman Bob Brockman stated in 2009, "there's not a chance" Microsoft could affect Reynolds' business.[4]

32.     DMS providers other than CDK and Reynolds are typically small, occupy a particular niche, and serve smaller dealers in the U.S.

**C.      Defendants Exploit Their Market Dominance by Exercising Leverage Over Dealers**.

33.     CDK and Reynolds exert leverage over car dealerships by: (1) selling their proprietary DMS software and services pursuant to long-term contracts, typically between five and seven years in length, often with automatic extensions if new services are ordered in the middle of the contract; (2) making it difficult for dealers to switch DMS providers; and (3) causing high costs in switching DMS platforms by restricting critical third-party applications from accessing a dealer's data.

---

[3] David Barkholz, "Dealers Get New Management System Option," Automotive News (Dec. 2, 2012), available at http://www.autonews.com/article/20121202/RETAIL07/312039973/dealers-get-new-management-system-option.

[4] "Data system is Brockman's latest surprise," Automotive News (Jan. 25, 2009), available at http://www.autonews.com/article/20090125/RETAIL06/301259970/data-system-is-brockmans-latest-surprise.

34.    One industry executive stated that changing DMS providers "is akin to a heart transplant."[5]

35.    CDK's CEO has acknowledged that "The reality is that, switching DMS providers can be very difficult. It will be quite a process change and takes time, which is part of the reason that many dealers are hesitant to switch. That said, CDK has successfully converted thousands of customer sites in the past, including many of the top 10 dealer groups and we will continue to do so."[6] CDK's average DMS client tenure is 20 years.[7]

36.    For example, Hendrick Automotive Group ("Hendrick"), the sixth largest dealership group in the country, announced that it had decided to switch from Reynolds to CDK, with the goal of completing the transition by mid-2017.[8] However, six months later, CDK disclosed that Hendrick had decided against the move because of the difficulty, cost, and disruption caused by switching platforms.[9]

---

[5] David Barkholz, "DMS Dilemma: Why it's so hard to switch," Automotive News (May 10, 2010), available at http://www.autonews.com/article/20100510/RETAIL07/305109976&template=print.

[6] CDK Global's (CDK) CEO Brian MacDonald on Q1 2017 Results – Earnings Call Transcript, available at https://seekingalpha.com/article/4018238-cdk-globals-cdk-ceo-brian-macdonald-q1-2017-results-earnings-call-transcript?part=single.

[7] See Correspondence from Elliott Management Corp. to Board of Directors of CDK (June 8, 2016), available at https://www.10xebitda.com/wp-content/uploads/2016/12/Elliott-Second-Letter-to-CDK-Global-Jun-2016.pdf.

[8] Vince Bond, Jr, "CDK signs up Hendrick Group," Automotive News (May 16, 2016), available at http://www.autonews.com/article/20160516/RETAIL07/305169943/cdk-signs-up-hendrick-group.

[9] Vince Bond, Jr., "CDK's 'fantastic win' is now lost," Automotive News (Nov. 7, 2016), available at http://www.autonews.com/article/20161107/RETAIL07/311079964/cdks-fantastic-win-is-now-lost.

37.    The costs of switching DMS platforms are heightened because CDK and Reynolds can paralyze a dealer's business by restricting critical third-party applications from accessing a dealer's data. The DMS houses a dealer's data, and third-party applications must be able to access that data in order to perform important services for the dealership. Although dealers own the data stored on the DMS, CDK and Reynolds have control over access to dealer data. CDK and Reynolds can disrupt a dealer's business simply by switching off third-party access to essential dealer data.

38.    "Behind dealership DMS systems, there is a big fight taking place worth hundreds of millions of dollars that few dealers know about, despite its potential to take huge profits from the bottom line."[10] Further, the "elephant in the room is how much money third parties must pay to access the DMS data on behalf of a dealership, and how those charges are hidden as they are passed on down to the dealers. It's as if there is a massive 'data tax' being paid by most dealerships that few know they are paying, let alone how much they are paying. Because it's an unknown, it is currently near impossible to manage, and such a tax has large effects on dealership profits and technology innovation."[11]

39.    When dealers purchase a DMS system, they are locked in to that purchase due to the high cost of switching providers. CDK and Reynolds lock their DMS customers into long-term contracts. As noted above, switching DMS providers is expensive and difficult, and the average dealer uses the same DMS provider for approximately 20 years.

---

[10] "The Hidden Data Tax That Dealers Don't Know They Are Paying," DrivingSales News (Oct. 17, 2013), available at http://www.drivingsales.com/news/the-hidden-data-tax-that-dealers-dont-know-they-are-paying-2/.

[11] *Id.*

**D.      Defendants Admit that Dealers Own Their Data**.

40.      The data on a dealer's DMS is not owned by the DMS provider. Rather, the data is owned exclusively by the dealers. CDK and Reynolds have admitted this in public statements by senior executives, on their websites, and in their DMS contracts.

41.      Until they began their anticompetitive conduct, CDK and Reynolds also publicly recognized that dealers, as owners of their data, have the right to control who has access to their data, including by sharing it with data integrators.

42.      Tom Schwartz, Reynolds' chief spokesperson, stated: "The data belongs to the dealers. We all agree on that."[12] Reynolds represents to dealers that, "[d]ata is your number one asset. Reynolds recognizes you need to share that data outside your dealership."[13]

43.      Howard Gardner, CDK vice president over data strategy, has stated that CDK "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."[14] CDK's website likewise states: "[D]ealerships own their data."[15]

44.      Steve Anenen, CDK's longtime and recently retired CEO, publicly stated that dealers have the right to grant third parties, such as data integrators, access to their data. "We're not going to prohibit that or get in the way of that," he told the industry publication *Automotive*

---

[12] David Barkholz, "Dealers decry Reynolds crackdown," Automotive News (Nov. 21, 2011), available at http://www.autonews.com/article/20111121/RETAIL07/311219997/dealers-decry-reynolds-crackdown.

[13] http://www.reyrey.com/solutions/data_management/dealer_options.asp.

[14] http://www.cdkglobal.com/company/news/adp-announces-new-approved-vendors-adps-third-party-access-program#sm.0018q57jt15mhd6ft6g2k67smqm4p.

[15] *Id.*

*News* in 2007.[16] "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?"[17]

45.    Kevin Henahan, CDK's senior vice president of marketing, delivered the same message to dealers and the industry: "We don't tell the dealer, if someone wants access to their data, they have to come to [CDK] to gain access to the data. It's ultimately the dealer's data. If he wants to give that data to somebody, for us to try to charge a toll doesn't seem like the right thing to do. So we're not going to go down this path."[18]

46.    The Reynolds and CDK DMS contracts "spell out which party owns the data and there is generally little dispute: the data belongs to the dealer. This makes sense; after all, it's the dealership's customers, inventory, and transactional data that the dealership is putting into the DMS system."[19]

47.    On February 2, 2007, the National Auto Dealers Association ("NADA") and American International Automobile Dealers Association ("AIADA"), the two largest automobile dealer associations in the United States, issued a "Joint Policy Statement on Data Accessibility."[20] The purpose of the statement was to "guide the use and protection of data in

---

[16] Ralph Kisiel, "Dealers should control access, ADP says," Automotive News (Feb. 19, 2007), available at http://www.autonews.com/article/20070219/SUB/70216070?template=print.

[17] *Id.*

[18] Ralph Kisiel, "Dealer security stirs insecurity," Automotive News (Dec. 4, 2006), available at http://www.autonews.com/article/20061204/SUB/61201031/dealer-security-stirs-insecurity.

[19] "The Hidden Data Tax That Dealers Don't Know They Are Paying," DrivingSales News (Oct. 17, 2013), available at http://www.drivingsales.com/news/the-hidden-data-tax-that-dealers-dont-know-they-are-paying-2/.

[20] NADA Press Release, NADA, AIDA, Issue Joint Policy Statement on Data Accessibility (Feb. 2, 2007).

dealer management systems," set forth the following principles: (1) "[d]ealers should control access to the data stored in their dealership management systems"; (2) "[d]ealers, not dealership management system vendors or other entities, should have the sole right and the practical means to authorize third parties to access and extract dealer data"; and (3), "[d]ealers expect all parties involved in storing and using dealer data to . . . refrain from unreasonably impeding dealer-authorized access to dealer data."[21]

48.    A large coalition of dealers, application providers, data integrators, and DMS providers, including CDK, formed an industry group called Open Secure Access, Inc., which described itself as "a coalition of companies that believe dealers should control access to the data they own and determine how it is used."[22] CDK was one of the group's first members. The group published a set of basic principles to guide the industry, including that "dealers should control who accesses their data," "[t]hird parties that have dealer permission to utilize a dealer's data should be able to access the data through their own efforts or through the services of an independent company," and "DMS companies should facilitate interaction with all data available to a DMS user by providing technologically advanced means to interact with (read and write) that data, either through a robust set of APIs, system functionality, or direct access to the database."[23]

---

[21] *Id.*

[22] https://web.archive.org/web/20070304105119/http://www.opensecureaccess.com:80/OSAOpen Letter.pdf.

[23] *Id.*

**E.    Defendants' Pattern and Practice of Anticompetitive Conduct is Further Exhibited in the DDI Market.**

49.    As noted above, Defendants also provide Dealer Data Integration ("DDI") services.

**(1) DDI Background**

50.    Third-party application providers, often referred to as "vendors" in the industry, need access to dealer data in order to perform essential services for the dealer. DDI consists of pulling dealer data from the DMS, formatting and aggregating it, and then providing it to vendors in a usable form appropriate to the particular services that a vendor provides to a dealer.

51.    Vendors do not obtain data directly from dealers. Separate companies known as "integrators" specialize in extracting dealers' data from DMS databases, aggregating that data and putting it into a standardized format, and then delivering to vendors the specific data required for their applications. The pulling of data by integrators is sometimes referred to in the industry as "polling" data. Integrators are able to pull and deliver data in an automated, seamless way without the need for manual intervention by dealers.

52.    Dealers use software applications to perform important sales and operational functions. These applications perform services in addition to or in replacement of functions provided by the DMS software. Such tasks include vehicle inventory management, customer relationship management, electronic vehicle registration and titling, and scheduling service and repair appointments. A single dealership rooftop may use ten or more separate application providers, or vendors.

53.     Vendors must obtain the required dealer data from the dealer's DMS. Dealers do not store their data on any other system or database. According to CDK, the data on a dealer's DMS is "irreplaceable."[24]

54.     Vendors that provide electronic vehicle registration and titling must be able to retrieve purchaser, vehicle, and financing information about the sale of a car from the dealer's DMS. Without access to that data, vendors cannot register and title the car with the state.

55.     CDK and Reynolds also have applications for services that are separate from their DMS services. For example, CDK and Reynolds both have customer relationship management applications, and they have a wholly owned joint venture that provides electronic vehicle registration and titling.[25] Therefore, many of CDK's and Reynolds' own applications compete with those offered by third-party application providers.

56.     Some applications not only require data that is "pulled" from a dealer's DMS, but they also need to "push" data back into the database. An example of this type of application is customer relationship management software, which helps dealers record and track potential customers. A customer's information and vehicle preferences are first entered into the customer relationship management application, which then handles the relationship until a car is sold to the customer. This application requires a dealer's car inventory, data which is "pulled" from the

---

[24] *See* CDK Global, "Third Party Access (3PA) Program Vendor Overview, Approved Access to Data is Common Sense," available at http://www.cdkglobal.com/sites/default/files/3PA_OneSheet.pdf.

[25] Defendants operate a joint venture, Computerized Vehicle Registration Inc. ("CVR"), which is wholly-owned by Defendants, with CDK owning 80% of CVR and Renolds owning 20%. CVR is promoted as a market leader in electronic vehicle registration ("EVR"), servicing more than 15,000 dealerships in 23 states and processing over 14 million EVR transactions a year.

DMS. The application must then be able to "push" the customer and sales information back into the DMS database.

57. Some of the largest application providers in need of data integration services are the car manufacturers who need access to dealer data in order to help manage car and parts inventory, process warranty claims and recall notices, apply rebate and special promotions to car sales, and assist dealers with marketing and lead generation. Manufacturers rely on data integrators to access dealer data, which is essential to the functioning of the entire automobile industry.

58. Before a data integrator can pull data, it must get specific authorization from the dealer. Dealers must set up separate login credentials for the integrators so that they can access the DMS database to pull the data. Once dealers set up those credentials, the data integrator can automate the pulling of data through user emulation. The user emulation software runs the data reports and captures the data, using the database software in the same way as a user at a dealership would. The only difference is that the integrator automates the process, whereas a user at the dealership would retrieve the data manually. This method for pulling data, sometimes referred to as "data scraping" or "screen scraping," is standard not only in the dealer data integration market, but also in numerous other industries, such as banking and healthcare, where data must be pulled from databases for use in applications.

59. Data integrators pull data from the dealer's DMS database and then convert that data from a raw, unorganized state into a standardized format that is easy for vendors to use. Each DMS provider has data in different formats, and dealers themselves enter data differently based on their own individual practices. Data integrators interpret, reformat, and translate the data into a standardized format. They also correct data-entry errors or anomalies in the data set,

such as missing numbers from vehicle identification numbers ("VINs") or incorrect customer contact information.

60.     The data integrator then delivers the data to vendors specifically selected by the dealer. The data provided to the vendor is limited to that which is specifically required by the application. For example, for electronic vehicle registration, the application receives vehicle sale and financing information, but nothing more.

61.     There used to be numerous participants in the DDI market. Today, only CDK, Reynolds, and Authenticom, Inc. ("Authenticom") participate in the DDI market.

62.     Dealers authorize but do not pay integrators to pull their data. Instead, vendors pay integrators for their data services. Prices charged by CDK and Reynolds are far higher than competitors' prices, such as those charged by Authenticom.[26]

63.     Vendors enter into contracts with data integrators to pull the data. The length of the contract varies widely depending on the data integrator. CDK's and Reynolds' vendor contracts are typically three years in length.

### (2) CDK Ownership of Dealer Data Integrators.

64.     As noted above, CDK owns two of the largest dealer data integrators in the industry, Digital Motorworks and IntegraLink. CDK also has a data integration product for direct access to data on the CDK DMS, known as the "Third Party Access" or "3PA" program.

65.     In 2002, CDK acquired Digital Motorworks, which claims to work with over 100 vendors and pull data from thousands of dealerships. CDK acquired IntegraLink in 2010.

---

[26] *See Authenticom, Inc. v. CDK Global, LLC and The Reynolds and Reynolds Co.*, 3:17-cv-00318 (W.D. Wis.) ("Authenticom Complaint"), at ¶ 59.

IntegraLink specializes in the collection of data from automotive retailers' dealership management systems.

66.     Before CDK and Reynolds entered into their 2015 market division agreement discussed below, Digital Motorworks and IntegraLink pulled data from Reynolds dealers using login credentials, instructing dealers to provide them with a "dedicated account" and password.[27]

67.     In 2011, Reynolds started blocking and disabling CDK's usernames, disrupting Digital Motorworks' and IntegraLink's pulling of data. As described by CDK to dealers at the time, "Reynolds has instituted policies designed to prevent automated processes such as those used by IntegraLink, [Digital Motorworks,] and other third-party data-collection services from collecting data for programs you have enrolled in," and "when Reynolds blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform."[28] To counter this, CDK instituted a program called "SMART-R." As described by CDK, the application "automates the process of running [Reynolds DMS data] reports (7601/7602), captures and encrypts the output, and then securely transfers the data to IntegraLink" or Digital Motorworks.[29]

**(3) Reynolds Certified Interface Program**

68.     Reynolds provides access to dealer data on the Reynolds DMS through the Reynolds Certified Interface, or "RCI", program, which is Reynolds' equivalent to CDK's 3PA

---

[27] *See*, *e.g.*, https://www.integralink.com/hyundai/acct_check.html ("Reynolds [DMS] dealers should provide user ID, password, and store number with access to program 2213 & 6910 (report generator).").

[28] https://www.integralink.com/downloads/smartr/SMART-R_FAQ.pdf.

[29] *Id*.

data integration product. Reynolds does not have a product that pulls data from dealers that use non-Reynolds DMS systems.

69.    Before Mr. Brockman acquired Reynolds, dealers were free to have data integrators pull their data in automated ways by using login credentials and user emulation software. Mr. Brockman, citing security concerns, transformed the RCI program into the exclusive method for automated access to data on the Reynolds DMS and imposed large price hikes.  Mr. Brockman stated that there is "within the dealership system as much personal information as there would be inside banks. Can you imagine a bank that would have a dial-in modem attached to its system where, if the bank felt like it, it could give out the password and let third parties access it? The suggestion is ludicrous."[30]

70.    However, in March 2015, Malcolm Thorne, CDK's then chief strategy officer – told *Automotive News* that "the pull process of extracting data is as safe as pushing out."[31] Using login credentials to pull data is standard across industries, including in banking and healthcare.

71.    Auto manufacturers, some of the largest application providers or vendors in the industry, have defended the right of dealers to control access to their data. After Reynolds changed its policy and began blocking data integrators from pulling dealer data, DaimlerChrysler AG issued a letter to its dealers stating: "A large DMS provider has announced their intent to discontinue the ability of third-party [integrators] to extract data via your DMS . . . .

---

[30] Ralph Kisiel, "Question and Answer: Deal Puts Brockman in the Spotlight," Automotive News (Feb. 19, 2007), available at http://www.autonews.com/article/20070219/SUB/70215038/question-%26-answer%3A-deal-puts-brockman-in-the-spotlight.

[31] David Barkholz, "Dealerships work to safeguard data as security breaches loom," Automotive News (Mar. 9, 2015), available at http://www.autonews.com/article/20150309/finance_and_insurance/303099949?template=print.

DaimlerChrysler has concern with this new policy, as it may have a significant impact to your business."[32] Referring to CDK's Digital Motorworks and IntegraLink, DaimlerChrysler noted that "[t]hese companies have been polling dealership data on our behalf for over 10 years and have yet to incur a single security breach in the extraction or delivery of our dealership data."[33]

72.     Prior to 2015, CDK used Reynolds' blocking of data access as a marketing tool to convince dealers to switch DMS platforms, and some dealers did switch from Reynolds to CDK on reliance that CDK would not take the same position.

73.     The RCI program operates in nearly identical ways to CDK's 3PA program. Like the 3PA program, the Reynolds RCI program is the only means by which vendors are allowed to obtain automated access to dealer data on the Reynolds DMS, and Reynolds blocks third-party access to dealer data by disabling credentials created by dealers for other data integrators. Reynolds also contractually restricts both dealers and vendors from using competing integrators.

74.     Reynolds does not publicize its data integration pricing. Upon information and belief, Reynolds has a pricing committee chaired Mr. Brockman that determines the rates on a vendor-by-vendor basis, and the data integration fees under the RCI program are higher than CDK's under the 3PA program.

75.     Reynolds also has a tool called "Dynamic Reporting," which is a non-automated function for dealers to manually generate a data report. Dealers must manually generate the report, and then send the necessary data to a vendor every time the vendor requires the data for its application.

---

[32] Ralph Kisiel, "DaimlerChrysler Fears Data Security Concerns Will Cost Dealers," Automotive News (Feb. 5, 2007), available at http://www.autonews.com/article/20070205/SUB/70202065?template=print.

[33] *Id.*

**F. Defendants' Anticompetitive Agreement, Exclusive Dealing and Coordination**

76.    Defendants' anticompetitive scheme comprised (1) entering a February 2015 market division agreement pursuant to which they agreed not to compete in DDI; (2) imposing exclusive dealing provisions on dealers and vendors; and (3) coordinating to block other independent data integrators.

**(1) Defendants Enter an Anticompetitive Agreement to Allocate the DDI Market**.

77.    On February 18, 2015, CDK and Reynolds entered into a written agreement categorized as a "Wind Down Access Agreement," which divided the DDI market. Pursuant to this agreement, CDK agreed that it would no longer compete with Reynolds in providing integration services for dealers using the Reynolds DMS. After the agreement, Digital Motorworks and IntegraLink discontinued their data pulling business for dealers using the Reynolds DMS, ceding that ground exclusively to Reynolds.

78.    The DDI market is an aftermarket of the primary DMS market.  If there were no dealer DMS systems, there would be no demand for integration services for dealer data.

79.    The purpose of the agreement between CDK and Reynolds is to protect their duopoly and market power in the DMS market and to obtain and maintain respective monopolies with the CDK and Reynolds aftermarkets in the DDI market.

80.    With respect to the DDI aftermarkets, the 3PA and RCI programs are projected to earn over $1 billion in combined revenue by 2019. CDK and Reynolds have monopolized their respective DDI aftermarkets. Specifically, CDK has a nearly 100% market share for dealer data integration services for dealers using the CDK DMS, and Reynolds has the same for dealers using the Reynolds DMS. The profit margins for Defendants' data integration businesses exceed at least 50%.

81.     Having agreed not to compete with each other in the integration market, CDK and Reynolds next took steps to eliminate their remaining competitors. CDK and Reynolds took numerous steps to obstruct other dealer data integration providers from obtaining access to dealers' data, including disabling the login credentials to the DMS system created by dealers to provide authorized access to independent integrators. Defendants have succeeded in eliminating all competition in the data integration market except Authenticom.

82.     The agreement provided for coordination between the Defendants to transition vendors from CDK to Reynolds. On March 2, 2015, CDK sent a letter to its vendor clients announcing that the vendors "will be provided with a roadmap to transition to the Reynolds Certified Interface (RCI) program without any further risk of interruption to existing services." CDK explained that "we are in a transition period to allow time for [Digital Motorworks] clients to enroll in the RCI program in support of your R&R dealers," and that "we will assist you to facilitate a smooth transition." The letter noted that Reynolds had "agreed to protect the current [Digital Motorworks] process for collecting data from R&R dealers during this transition" and promised "a more detailed letter within the next couple of weeks that outlines the transition process." CDK, through Digital Motorworks and IntegraLink, continues to pull data from dealerships using non-Reynolds DMS systems as it did before the market allocation.

83.     On April 1, 2015, CDK sent a follow-up letter to its vendor customers, which states, "[a]s announced earlier this month, the recent business agreement between CDK Global and The Reynolds and Reynolds Company (R&R) provides for the clients of Digital Motorworks, Inc. (DMI) a streamlined process to enroll in the Reynolds Certified Interface (RCI) program for their R&R dealers. We are now in the transition period to allow sufficient time for this enrollment, and R&R has agreed to provide a grace period for the existing DMI

process for R&R data collection during this time." The letter then provided a deadline for enrollment in the RCI program. "Your deadline for RCI Certification, listed above, refers to when you need to be RCI Certified and the R&R grace period is schedule to end. R&R is ready to assist you with your transition to the RCI process." CDK also offered assistance, "If you would prefer assistance, just let me know, and I will be happy to schedule and participate in an introductory conference call on your behalf."

84.    CDK's letter promoted RCI participation by stating, "[w]e are pleased to be working with R&R to bring you this streamlined, supported process for handling dealership data for your R&R dealers." In relation to CDK's agreement not to compete, the letter stated that if the vendor was "not RCI Certified, it will be more difficult to reliably receive dealership data since DMI is no longer extracting data directly from Reynolds systems." The market division agreement still allowed Digital Motorworks to pull data from the Reynolds DMS so long as the vendors paid Reynolds first by enrolling in the RCI program. Referring to Digital Motorworks as a "technical agent," the letter explained that "DMI will be able to receive data directly from R&R on your behalf through the RCI program. You will continue to receive the benefits of our data cleansing, standardization, integration and related support services."

85.    CDK ended the letter by noting that it had successfully "transitioned clients to the RCI program in the past, and it has proven to be a successful approach to consistent, reliable data extraction." With respect to how "this new approach differ[ed] from the previous one," the letter stated, "Prior to this agreement, DMI would extract data directly from its R&R dealers, however there was no guarantee that the data wouldn't be interrupted during the data extraction process . . . . With the RCI program, the data is pushed from the DMS through a certified interface," which CDK claimed made "the process more reliable and consistent."

86.     Before February 2015, the 3PA program had three levels. The first level was "basic access" by which a dealer "supplie[d] third-party vendor[s] a user ID and password to access the dealership's system."[34] This level of access was a recognition that dealers have a right to grant access to their data to whomever they wish, and CDK imposed no charges for this. The second level was "subscriber access" in which CDK "provide[d] secure, high-speed Internet access" to the DMS, with the "[d]ealer maintain[ing] responsibility for data access."[35] CDK charged a small amount for the Internet service. The final level was "Third-Party Integration," which was data access obtained directly from CDK and included "real-time access" and a "bi-directional interface," allowing for both pulling data from and pushing data into the DMS.[36] CDK's prices for this increased level of data access were higher than the prices charged by competitor Authenticom, averaging approximately $70 per month per dealership rooftop.

87.     After CDK and Reynolds entered into their market division agreement in February 2015, CDK modified its 3PA program to match Reynolds' program. CDK now blocks dealers from granting third-party integrators access to dealer data. The revised 3PA program requires all vendors to obtain data directly from CDK at much higher prices. On average, CDK now charges vendors on average between $250 and $300 per connection, almost triple the $70 that it charged before for the exact same services. For bi-directional access, or pulling data from the DMS and pushing data back into the database, CDK charges vendors up to $700 per connection.

---

[34] Ralph Kisiel, "ADP Provides Dealers 3 Options on Data Access," Automotive News (Feb. 19, 2007), available at http://www.autonews.com/article/20070219/SUB/70215040/adp-provides-dealers-3-options-on-data-access.

[35] *Id.*

[36] *Id.*

88.    CDK announced a revised 3PA program on June 22, 2015, as part of its "SecurityFirst" initiative. *Automotive News* reported that, "CDK is rolling out a new cybersecurity initiative that will raise monthly integration fees for most of the third-party software vendors that dealerships use in addition to CDK software. It is patterned after a program at Reynolds and Reynolds."[37] Further, "Vendors briefed on CDK's new data-security program said nothing will change in the way they get data from CDK-served DMS dealerships under SecurityFirst except for a higher price."[38] Vendors "in the CDK program . . . say the costs being charged far exceed the value of any increased data security."[39] One "vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security."[40]

89.    Vendors pass the cost of access to dealer data on to the dealers themselves in the form of higher service fees.  The Banks Report, the industry's leading newsletter, commented in October 2015 on Defendants' motives: "It's clear, part of that playbook involves charging third-party vendors significantly more for access to the data. It's one area that can provide an almost immediate bump to the bottom line. And as [CDK's] activist investors reportedly are looking for a quick exit, any increase to the bottom line will make for a better sales price."[41] "According to

---

[37] David Barkholz, "CDK Global Sees Earnings Boost from Cost-Cutting, Improved Efficiency," Automotive News (Nov. 3, 2015), available at http://www.autonews.com/article/20151103/RETAIL/151109957/cdk-global-sees-earnings-boost-from-cost-cutting-improved-efficiency.

[38] David Barkholz, "Dealers Will Pay Up for Vendors' Data Access After CDK Switch," Automotive News (July 20, 2015), available at http://www.autonews.com/article/20150720/RETAIL07/307209962/dealers-will-pay-up-for-vendors-data-access-after-cdk-switch.

[39] *Id.*

[40] *Id.*

[41] Cliff Banks, "Data Access Battle Goes Nuclear," The Banks Report (Oct. 12, 2015).

numerous vendors I've talked with, prices to access data in CDK's systems under the new initiative could increase anywhere from 300% to 800%."[42]  Further, "[d]ealers are caught in the middle – either they'll end up seeing increased charges from their vendors or, they'll see a sudden drop off in service from their vendors."[43]

90.    Another widely read industry publication stated, "We see the direction that the DMS companies are moving for adding access fees through the guise of certification and security measures. The incremental costs being added are exorbitant (200, 300 and up to 500% increases in [data integration] fees) to [vendors], and end up coming back to the dealer in the form of higher monthly service fees for all applications using the dealer's data."[44]

91.    Data integrators charge vendors per dealership rooftop, sometimes referred to as a "connection." If a dealer has ten rooftops, then the vendor would need ten separate connections for that dealer. Competitor Authenticom states that it has consistently charged vendors $25 for one data feed and $50 for two or more. On average, Authenticom charges vendors between $30 and $40 a month per connection. For bi-directional access to dealer data, Authenticom has generally charged $75 per connection. Other independent data integrators charged similar rates. For example, between 2008 and 2016, SIS charged around $40 per connection for pulling data and $70 per connection for bi-directional access until it was forced out of the data integration market.[45]

---

[42] *Id.*

[43] *Id.*

[44] Brad Korner, "Dealers Taking Control of DMS Data," Driving Sales (July 31, 2015).

[45] Authenticom Complaint at ¶ 214.

92.    CDK and Reynolds now charge far higher rates than those charged by Authenticom and former data integrators. One prominent vendor paid Authenticom $35 per month to pull data. However, when the vendor was forced to join the RCI program for data integration services, the monthly rate charged by Reynolds was $210, a 500 percent increase. Another large vendor purchased data integration services from SIS for years, at a rate of $45 to $50 per month. However, that vendor now pays Reynolds monthly charges of between $300 and $866 and pays CDK monthly charges of between $300 and $700.[46]

93.    In addition to these monthly fees, CDK and Reynolds also charge vendors upfront fees to initiate services. CDK and Reynolds charge at least $30,000 to join the 3PA and RCI programs, with "setup" fees of around $300 or more per connection. Authenticom collects an upfront fee of only $2,500. Moreover, Authenticom does not charge an additional per-connection setup fee as CDK and Reynolds do.[47]

94.    Before 2010, Reynolds generally charged vendors less than $100 per month per connection. By 2013, after it had begun to block independent data integrators and impose and enforce exclusivity provisions in its contracts with dealers and vendors, Reynolds raised its monthly prices per connection from less than $100 to between $300 and $500, a 200-400% price increase. After Defendants entered the 2015 agreement, Reynolds has been raising its prices for data integration services even more, including by charging many vendors a transaction charge for every data pull. CDK has instituted the same practice of charging some vendors an additional per-transaction fee on top of the monthly fees.[48]

---

[46] *Id*. at ¶ 215.

[47] *Id*. at ¶ 216.

[48] *Id*. at ¶ 220.

95.     In February 2017, The Banks Report provided an update, noting that "vendors complain the pricing is creating an untenable situation in the industry. Two separate vendors shared with TBR during the recent NADA convention that they each pay a combined $30 million to CDK and Reynolds for access rights."[49]   One dealer, Friendship Enterprises from Bristol, Tennessee, told *Automotive News* in December 2016 that, as a result of "CDK's data surcharge," it has large "'overhead [expenses] now that we shouldn't have. It's our data.'"[50]

96.     On July 29, 2015, Mr. Anenen told analysts during a year-end earnings call that, on the strength of cost-cutting and better bundling of software products, CDK expected adjusted earnings to rise "at least 25 percent" in 2016.[51]

97.     CDK has also engaged in deceptive advertising with respect to the new higher pricing. As part of the revamped 3PA program, CDK posted a pricing guide on its website that CDK represents is the standardized pricing for all vendors. "Our 3PA pricing philosophy is simple," CDK states in its program guide, "standardized pricing for all customers." However, CDK imposes higher prices than what it advertises. For example, CDK told one vendor providing electronic vehicle registration and titling that the vendor would have to pay 25% of its top-line revenues to participate in the 3PA program, which is deceptively higher than the advertised pricing.

---

[49] Cliff Banks, "CDK, Reynolds and Reynolds Sued for Alleged Antitrust Practices," The Banks Report (Feb. 4, 2017).

[50] Vince Bond Jr., "Held Hostage": Dealer's Battle with Software Giants Escalates," Automotive News (Dec. 26, 2016).

[51] David Barkholz, "CDK Sees 25 Percent Profit Growth in 2016," Automotive News (July 29, 2015), available at http://www.autonews.com/article/20150729/OEM06/150729848/cdk-sees-25-percent-profit-growth-in-2016.

98.    Today, CDK declares that the 3PA program is the "only approved method for accessing" data on a dealer's DMS. It labels any other method for accessing data as "unauthorized." According to CDK, a dealer breaches its contract when it provides unauthorized access to other data integrators. CDK now contractually forbids vendors from obtaining data from anyone but CDK. Thus, CDK has made the 3PA program the only means by which vendors can obtain the necessary data for dealers using the CDK DMS.

99.    Upon information and belief, CDK's and Reynolds' conspiracy was formed and implemented by top-level executives at each company. For CDK, executives allegedly involved in the conspiracy include Robert N. Karp, President of CDK North America and the person with oversight of CDK's 3PA program; Howard Gardner, CDK's Vice President and Manager of Data Strategy and the person who took the lead on the market division agreement; Dan McCray, CDK's recently retired Vice President of Product Management; and Kevin Distelhorst, CDK's Chief Customer Officer, the founder of IntegraLink, and a former executive at Reynolds. Upon information and belief, other senior CDK executives were also involved in planning, executing, and implementing Defendants' unlawful agreement.

100.    Upon information and belief, executives allegedly involved in the conspiracy for Reynolds are Bob Brockman, Reynolds' Owner, Chairman, and CEO, and the person who approved the market division agreement and formulated the policy to eliminate competition through blocking; and Robert Schaefer, Reynolds Director of Data Services and the person in charge of the RCI program. Upon information and belief, other senior Reynolds executives were also involved in planning, executing, and implementing Defendants' unlawful agreement.

101.    Defendants' agreement had its intended effect in that vendors switched from Digital Motorworks' and IntegraLink's data integration services into the Reynolds RCI program, paying far higher prices for the same services.

**(2)    Defendants Impose Exclusive Dealing**.

102.    Whether a dealer chooses CDK or Reynolds, dealers will be locked into the same anticompetitive exclusive dealing arrangements.

103.    In their DMS contracts with dealers, both CDK and Reynolds require dealers to agree that they will not provide anyone other than the DMS provider access to their data for purposes of data integration and syndication to vendors. The contractual terms thus prohibit dealers from granting access to other data integrators.

104.    After CDK disabled Authenticom's login credentials, one dealer protested to CDK, "You do not have our authorization to disable user accounts. It is my data and I decide who has access to it." After CDK responded that it had the right to control access, the dealer asked for "documentation validating CDK is allowed to disable OUR accounts to OUR data without OUR permission." CDK responded that the DMS Agreement "contains language stating that unauthorized access to the DMS is prohibited."[52]

105.    CDK added the following warning to dealers on its dealer login page: "Please be advised that the creation of User IDs for use by unauthorized third parties violates the terms of your CDK [DMS] Agreement."[53]

106.    In addition to inserting exclusive dealing provisions in their dealer contracts, CDK and Reynolds have also inserted exclusive dealing provision provisions in their data

---

[52] Authenticom Complaint at ¶ 12.

[53] *Id*. at ¶ 155.

integration contracts with vendors. As a result, a vendor using CDK or Reynolds for data integration services must agree only to use CDK or Reynolds, and forgo using anyone else.

107.    Specifically, the CDK 3PA and the Reynolds RCI contracts contain exclusive dealing provisions that prohibit vendors from obtaining dealer data from anyone other than CDK, through the 3PA program, or Reynolds, through the RCI program. Thus, if a vendor obtains dealer data through the 3PA program or the Reynolds RCI program, the vendor is barred from obtaining the dealer data from any other integrator. Vendors that obtain dealer data from any other integrator are subject to large fines, threats to cancel the vendor's contract, and audits.

108.    CDK and Reynolds impose "Price Secrecy Provisions" in their 3PA and RCI contracts. These provisions prohibit vendors from informing dealers about the data access fees, even though the data access fees are often passed down to dealers in the form of higher vendor prices. Through these provisions, CDK and Reynolds make it very difficult for dealers to know the true cost of DMS services. Dealers ultimately bear the cost of the data access fees imposed by CDK and Reynolds.

109.    For example, in August 2016, Reynolds sent a letter to the vendor stating that it had "come to Reynolds' attention that [the vendor] has materially breached the Agreement by violating, without limitation, the Agreement's prohibition against Non-Approved Access and/or Non-Approved Use" by obtaining dealer data from Authenticom. "More specifically," the letter explained, "Reynolds recently received documentary evidence from one of our mutual dealership customers showing that [the vendor] is flagrantly violating the above provisions by using an unauthorized, third-party data broker to extract data" for one of the vendor's applications. Reynolds threatened to terminate the RCI agreement with the vendor unless the vendor agreed to "immediately cease and desist" from using dealer data extracted "using a non-RCI method (e.g.,

using Authenticom/DealerVault software)." Reynolds demanded that the vendor "submit to a third-party audit (at [the vendor's] expense) . . . to verify that all instances of the use of non-RCI data extraction have been reported and addressed."[54]

110.    Defendants' exclusive dealing provisions are effective for years. Defendants' DMS contracts with dealers typically last five to seven years. Reynolds' contracts with vendors are typically three years with automatic renewals, and CDK's exclusive dealing terms with vendors purport to be indefinite and non-terminable.

### (3) Defendants Forced Competitors Out of the DDI Market.

111.    Superior Integrated Solutions, Inc. ("SIS") was a leading data integration provider, servicing thousands of car dealerships. CDK and Reynolds excluded SIS from the market through blocking and litigation tactics. Reynolds first sued SIS for tortious interference, claiming that by having dealers grant SIS access to their data, the dealers were in breach of their DMS contracts. SIS settled and left the integration market for dealers using the Reynolds DMS. In August 2016, under the threat of blocking and password-disabling, CDK forced SIS to shut down its integration services for dealers using the CDK DMS.

112.    SelectQu, owned by Dominion Enterprises ("Dominion"), is another dealer data integrator that was forced out of the market. Dominion provides a large number of software services in the automobile market and owns several popular applications that provide inventory, reputation management, and customer relationship management services for dealers. In order to obtain approval for participation in the 3PA and RCI programs for these applications, CDK and Reynolds forced Dominion to agree that SelectQu would no longer pull data from their DMSs. As a result, SelectQu exited the market.

---

[54] *Id*. at ¶ 172.

113.    New Freedom Data Resources, founded in 1991 and a pioneer in the market, was forced to shut down its data integration business in 2014 as a result of Reynolds' blocking actions.

114.    The StoneEagle Group recently ended its data integration business in exchange for CDK and Reynolds allowing its data analytics application into the 3PA and RCI programs.

115.    ProQuotes, Inc. was cut off from accessing data on CDK DMSs in the fall of 2016, and as a result exited the data integration market.

**(4) Competitors Sue Defendants for Violation of Antitrust Laws**

       **1.    <u>Motor Vehicle Software Corporation Lawsuit</u>**

116.    In February 2017, one of Defendants' competitors, Motor Vehicle Software Corporation ("MVSC"), filed suit under federal and state law against Defendants for conspiring to prevent MVSC from accessing dealership data stored in Defendants' dealership management software.[55]  MVSC alleges that Defendants have precluded MVSC from accessing dealership data necessary to process vehicle registrations with state agencies.  MVSC alleges that Defendants entered an unlawful horizontal agreement to exclude MVSC from Defendants' third-party programs in order to prevent MVSC from obtaining data necessary to provide electronic vehicle registration services.  According to MVSC, Defendants denied access to the data outright or quoted extortive fees for access.  MVSC also named as a defendant Computerized Vehicle Registration Inc., a joint venture of Defendants that is a competitor of MVSC for vehicle registration services.

---

[55] *Motor Vehicle Software Corporation v. CDK Global, Inc. et al.*, 2:17-cv-896 (C.D. Cal.) ("MVSC Complaint").

117.    MVSC alleges that as of January 2014, CDK and Reynolds entered an illegal agreement to block MVSC from participating in third-party access programs.[56]

118.    On October 2, 2017, the U.S. District Court for the Central District of California denied CDK's and Reynolds' motion to dismiss MVSC's claims under Section 1 of the Sherman Act. 15 U.S.C. § 1, and California's Cartwright Act.  The Court granted CDK's and Reynolds' motion to dismiss MVSC's claims under Section 2 of the Sherman Act and other state laws, but granted MVSC leave to amend its complaint.

119.    In denying CDK's and Reynolds' motion to dismiss under Section 1 of the Sherman Act, the Court noted,

> Contrary to Defendants' contentions, MVSC has pleaded sufficient "who, what, when, and where" facts to state a plausible claim that CDK's and Reynolds' actions amount to more than mere parallel conduct. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015); *see also Twombley* [sic], 550 U.S. at 557 (when allegations of parallel conduct are set out to make a Section 1 claim, the plaintiff must plead enough nonconclusory facts to place that parallel conduct "in a context that raises a suggestion of a preceding agreement."). MVSC alleges: (1) it was quoted prices to participate in CDK's and Reynolds' third-party access programs that were in effect refusals to deal; (2) a CDK executive confirmed that MVSC would not be approved for 3PA access because CDK had classified EVR a "closed category" in order to keep MVSC from competing with CVR; (3) a CVR executive admitted that Reynolds' RCI participation quotes constituted a refusal to deal because they didn't "want [MVSC] in the program"; (4) CDK and Reynolds had a common motive to hamstring MVSC so that CVR could dominate the EVR market; (5) discussions related to the illegal agreement to cut MVSC out of the EVR market took place at CVR board meetings; and (6) CDK and Reynolds agreed and took affirmative steps to block MVSC's access to dealer data through means other than 3PA and RCI, by seeking to eliminate independent data integrators and prohibit dealers from transferring the data to MVSC.[57]

---

[56] *Id.* at ¶ 95.

[57] *See* Memorandum Opinion at p. 7, *Motor Vehicle Software Corporation v. CDK Global, Inc. et al.*, 2:17-cv-896 (C.D. Cal.) (Dkt. No. 73) (Oct. 2, 2017).

## 2. **Authenticom Lawsuit**

120.    On May 1, 2017, Authenticom filed a complaint for violations of the Sherman Act and for tortious interference with contracts against Defendants for entering into an alleged, express horizontal agreement to exclude competition in the DDI market, and to impose unlawful exclusive dealing provisions.[58]

121.    Authenticom alleges that it has uncovered substantial evidence demonstrating Defendants' agreement to eliminate competition in the DDI Market and the single-brand aftermarkets, including the following: (1) In February 2015, CDK and Reynolds entered into a written market division agreement in which they agreed not to compete in the markets; (2) Senior executives at both CDK and Reynolds have admitted to Authenticom's President, Steven Cottrell, that Defendants were engaged in a coordinated effort to block independent data integrators like Authenticom and drive them from the market; (3) CDK and Reynolds have employees working together to effectuate the blocking of independent data integrators; (4) CDK and Reynolds have jointly included exclusive dealing provisions in their agreements with dealers and vendors, securing for themselves the exclusive right to pull dealer data and then provide it to vendors.[59]

122.    Reynolds' blocking tactics began prior to the February 2015 anticompetitive agreement. CDK did not start blocking independent data integrators until it entered into the agreement with Reynolds in 2015. Reynolds first started disabling Authenticom's usernames in 2009 when it introduced gimmicks such as "challenge questions" and "captcha," where the user has to enter random blurred text, to make it more difficult to automate the pulling of data.

---

[58] *See* Authenticom Complaint.

[59] *Id.* at ¶ 118.

Reynolds also targeted Authenticom's usernames for specific vendors, disrupting the data flow for those vendors and thereby forcing them to join the RCI program. In June 2013, Reynolds intensified its tactics by disabling Authenticom's usernames en masse. "Effective immediately," Reynolds announced to its dealers, "Reynolds will begin the rollout of prohibiting automated access into" its DMS. "This will impact any process that is set up to directly access [the DMS] without any manual intervention." Over a three-month period in the summer of 2013, Reynolds disabled 27,000 profiles used by Authenticom at over 3,600 dealers. Reynolds' actions resulted in an almost complete collapse of Authenticom's integration business for dealer data for dealers using the Reynolds DMS.[60]

123.    On April 6, 2015 after Reynolds and CDK entered into their market division agreement, Mr. Schaefer, one of Reynolds' senior executives involved in forging the agreement, sent a letter to Authenticom threatening that "any knowing attempt by Authenticom to induce Reynolds dealers to allow such third party access . . . gives rise to liability on the part of Authenticom for, among other things, tortious interference with contracts."[61]

124.    A year later, on April 3, 2016, at an industry convention, Dan McCray (CDK's Vice President of Product Management) approached Mr. Cottrell and said that they should "take a walk." Mr. McCray led Mr. Cottrell off the convention floor and down a service ramp to a secluded area. Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "lock you and the other third parties out." In reference to a prior offer by CDK to acquire Authenticom's business for $15 million, Mr. McCray confirmed the illegal agreement again, stating that the number was so low because Authenticom's "book of

---

[60] *Id*. at ¶ 189.

[61] *Id*. at ¶ 156.

Reynolds business is worthless to us because of the agreement between CDK and Reynolds." Mr. McCray then grew threatening: "I wanted to look you in the eye and let you know man to man, I have been mandated by our new CEO to seek you out and destroy your business on our systems." Referring to the exclusive dealing provisions in the dealer DMS contracts, he stated that "we will enforce our contract with dealers and sue them if needed to keep you out of our systems." "For god's sake," he concluded, "you have built a great little business, get something for it before it is destroyed otherwise *I will f\*\*\*ing destroy it*."[62]

125.    In April 2015, Reynolds threatened to sue Authenticom for tortious interference. Authenticom rejected the threat, and in response noted that "a significant percentage of R&R's [dealer] customers also are Authenticom's customers" and, like Reynolds, Authenticom and the dealers "have contractual agreements." In response, on May 7, 2015, Reynolds' lawyer sent Mr. Cottrell a proposed "Wind Down" agreement. Authenticom would shut down its data integration business and, in exchange, Reynolds would stop blocking Authenticom's access to dealer data during the one-year wind down period during which Authenticom would be required to transition Authenticom's vendor clients into the RCI program, where they would pay Reynolds' higher integration fees. Authenticom refused to leave the market and was intent on providing "a safe and secure data movement option in a fair and competitive marketplace."[63]

126.    In May 2015, Mr. Schaefer, Reynolds' head of data services and one of the architects of the conspiracy, told Mr. Cottrell during a phone conversation that CDK and Reynolds had an agreement to support each other's 3PA and RCI programs and therefore block competitors like Authenticom from pulling dealer data. Mr. Brockman was adamant, Mr.

---

[62] *Id*. at ¶ 10.

[63] *Id*. at ¶ 185-186.

Schaefer said, that all third-party data integrators must be cut off. Mr. Schaefer also said that he was in communications with other DMS companies to try to convince them to join CDK and Reynolds in the agreement to block independent data integrators.[64]

127.    On August 1, 2016, Authenticom's employees discovered that CDK had disabled Authenticom's login credentials at thousands of dealerships. A throng of dealers and vendors called Authenticom, frantically trying to find a way to re-establish Authenticom's connection and resume the flow of data. Vendors and dealers alike had their business operations interrupted. Over the ensuing weeks and months, CDK unleashed wave after wave of blocking actions that disabled Authenticom's login credentials for thousands of dealerships. In terms of timing, CDK has informed dealers that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016." CDK then promised that in 2017 it would "further increase our security actions to prevent the use of unapproved data access methods."[65]

128.    In December 2016, during a discussion with a vendor about joining the 3PA program and leaving Authenticom, Steve French, CDK's senior director of client and data services, told the vendor that a large portion of his job was to work with Reynolds to ensure third-party data integrators like Authenticom remain locked out. Mr. French suggested that resistance to getting dealer data from CDK and Reynolds was futile as they were working together to lock out third party data integrators like Authenticom.[66]

129.    Dealers have lodged numerous complaints with Defendants regarding their blocking tactics. In November 2016, one Mercedes dealership in California wrote to CDK:

---

[64] *Id*. at ¶ 181.

[65] *Id*. at ¶ 188.

[66] *Id*. at ¶ 183.

"When will you stop the blocking of our user profiles? This must stop." The dealer decried CDK's "attempt to stop all other data access routes thereby forcing us to use [CDK's] data monetizing scheme if we want to access our data." The dealer further stated, "When will CDK stop trying to monetize data owned by [us] at our expense? All being orchestrated under the guise of 'protecting our data.' Frankly most can see right through this propaganda smoke screen. The data could be protected by using available technology that doesn't cut off the dealers' access to their own data using fully automated routines." The dealer explained that because of CDK's exorbitant data access fees, it could not use the applications it wanted: "We would like to purchase the XTime application. The CDK data access charges make that option prohibitively expensive. Did CDK actually think that these exorbitant data access charges levied against our third party solution providers would not get passed directly back to us?"[67]

130.    One Virginia dealer asked his employees "to raise holy hell with CDK. This is really affecting our business."[68]

131.    A Wisconsin dealer explained that it had even created a login for the owner of the dealership "to see if CDK had the nerve to deactivate it. They did! I have very strongly voiced by phone to my CDK rep to STOP IT."[69]

132.    A Lexus dealer in Ohio related that it had "lit into [CDK] about how CDK is making it more difficult for me now with this agenda of theirs (I even mentioned Authenticom's

---

[67] *Id*. at ¶ 191.

[68] *Id*. at ¶ 192.

[69] *Id*. at ¶ 192.

name and how I felt they were being unfairly singled out to frighten dealers regarding their DMS security)."[70]

133.    Dealers explained that they preferred the superior product and service they received from Authenticom. For example, a Lexus dealership in California wrote that "[a]s a dealership owner, I believe that CDK has no right to deny me access to my own data. By extension, I also retain my rights to distribute my data to chosen vendors who meet my strict criteria for data security." Further, the dealer wrote that "with each vendor requiring different kinds of data extraction, I feel it would be far more effective to support Authenticom and DealerVault, to build a great single point of extracted data, and plug my vendors into their ecosystem."[71]

134.    A Ford dealer in Wisconsin stated, "I have been very vocal to my CDK rep in terms of who owns the data and how their disruption of our business is costing us money in potential lost sales with our vehicle inventory not being up to date." However, "[t]he only [DMS providers] we are comfortable handling this business, unfortunately for us, is CDK and R&R."[72]

135.    After CDK and Reynolds disabled the dealer-created Authenticom credentials, dealers worked cooperatively with Authenticom to set up new credentials and reestablish access. However, as soon as dealers set up new login credentials, CDK and Reynolds disabled them.[73]

136.    A Nissan dealership from Indiana reported that it had "updated a few profiles and within 24 hours they are locked out again." A Delaware dealer contacted CDK "and yelled at

---

[70] *Id.* at ¶ 192.

[71] *Id.* at ¶ 193.

[72] *Id.* at ¶ 194.

[73] *Id.* at ¶ 195.

them for about 2 hours telling them to let me handle security and to stop touching my user list in every single situation. They refused to stop."[74]

137.    Dealers grew increasingly frustrated with Defendants' conduct. "I cannot continue to create new profiles nor does my schedule allow for time to reset this log on daily," a large California dealership stated. With respect to Reynolds, a large dealership group explained that the "process to recreate a user ID in Reynolds is not as simple as it used to be and now takes approximately 30 min. to remake [Authenticom's] account with the proper access[;] that is time I don't have." The dealer lamented that although it did "like what [Authenticom's] product does and the ease and control we have," it could not continue to deal with Reynolds' repeated disabling. Underscoring the leverage that DMS providers wield, a Massachusetts Ford dealer explained that "[w]e cannot play the nightly cat and mouse game of us enabling the [Authenticom] account – only to have them shut it down. We cannot put our company at risk by having CDK declare us – not secure – and shutting us out of our own server and making it impossible to do business."[75]

138.    A vendor reported to Authenticom that dealers "are so worried to go against the grain with CDK thanks to very threatening language being used. CDK is telling my dealerships that they risk litigation if they cooperate with enabling profiles." CDK "told another dealership that enabling profiles violates their agreement with CDK and it could result in aggressive action." A Toyota Reynolds dealership in California said "it does not matter what ID is used it will trigger the Suspicious Activity triggers according to [Reynolds] and shut down any account used to access Data," with the takeaway that "this issue will NEVER GO AWAY!" As one

---

[74] *Id*. at ¶ 196.

[75] *Id*. at ¶ 197.

Dodge dealer in Texas reported, its CDK "rep said that setting up a new profile would work for a day or two but our account is now being monitored. Basically he told me that they have control and that is the way it's going to be."[76]

139.    In conjunction with disabling Authenticom's profiles, CDK and Reynolds have contacted dealers to convince them to have their vendors switch to the 3PA and RCI programs.

140.    On August 22, 2016, Mr. Karp sent a letter to all of CDK's dealers served by Authenticom with the following message: "We are contacting you because your dealership has been identified as a client of a third party that is accessing your data through CDK systems by unauthorized means." He stated that CDK would no longer allow independent data integrators to access dealer data, and that vendors therefore needed to "begin the Third Party Access program application process immediately to avoid disruption." Mr. Karp followed up this letter with repeated communications to dealers throughout the fall of 2016. In letter from September 23, 2016, he told dealers to "[s]hare your list of vendors with us so that our Third Party Access program team can invite vendors who are not already part of the program to join."[77]

141.    Reynolds has delivered the same message with the same goal, repeatedly notifying dealers that it was "prohibiting automated access" to other data integrators and stating that, "[I]f a third party vendor you do business with is impacted by this, please refer them to the Reynolds Certified Interface hotline."[78]

142.    In multiple letters to dealers, Mr. Karp falsely stated that, "there are no limits on data elements that can be accessed, increasing the risk of misuse. There is also an inability for

---

[76] *Id*. at ¶ 199.

[77] *Id*. at ¶ 201.

[78] *Id*. at ¶ 202.

you to track and monitor where your data is going." Authenticom has asserted that these statements are false, that Authenticom pulls only the data dealers specify, and that dealers have complete control and visibility over the flow of their data with Authenticom's DealerVault. Mr. Karp warned of "unauthorized software" being "installed on your CDK DMS system," which is also false. However, Authenticom has asserted that it does not install any software on the DMS system, but simply runs data reports just as the dealer can. CDK and Reynolds also raised the concern that "sharing data through intermediaries such as Authenticom increases data handling risks," even though CDK does the same thing through Digital Motorworks and IntegraLink by pulling data.[79]

143.    "After being a loyal client for over six years," one longtime vendor client of Authenticom wrote, "we are compelled to make a business decision to pursue Third Party Access from CDK Data Services." Further, "Over the past 60 days, we have averaged 100 of our dealer clients blocked from DealerVault/Authenticom polling the dealer's data. The effect of these disruptions has taken a serious toll on our dealer business clients causing them to terminate or suspend marketing services with us."[80]

144.    "Between the Reynolds lockouts and the subsequent CDK lock-outs," another vendor explained, "our business has contracted due to dealer cancellations." Another wrote: "We have (reluctantly) fallen victim to CDK and have already moved several (nearly all) [accounts] to CDK." The data interruptions cost that vendor "the loss of tens of thousands of dollars that we cannot make up. Ensuring data is complete and flowing properly is essential to our business." As a result, the vendor saw "no choice but to bite the proverbial bullet and go back to CDK."

---

[79] *Id*. at ¶ 204.

[80] *Id*. at ¶ 209.

Dealerships often delivered the bad news themselves. "Due to major issues with DealerVault's Reynolds login getting disabled over and over again[,] [w]e need to cancel the account," a Reynolds dealership in Texas explained. "We now have [the vendor] pulling directly from Reynolds."[81]

145.    According to one vendor, the "process to onboard data via [Authenticom] is streamlined and much easier for both our company and the individual dealership. Plus, the data accuracy and formatting is very consistent when it is secured (this is not the case when data is pulled directly from CDK)." The vendor also stated, "the only party that truly suffers here is the actual dealer. It takes us longer to provide them the services they are requesting and have paid for. The data is not as clean, therefore requiring additional processes and data scrubbing and appending tools to be applied on our side. And the costs are greatly increased – literally double – due to the egregious fees that CDK charges."[82]

146.    In December 2016, after CDK disabled Authenticom's login credentials, Nebraska Ford dealer protested to CDK that, "You do not have our authorization to disable user accounts. It is my data and I decide who has access to it."[83]

147.    Before Defendants' anticompetitive conspiracy, Authenticom provided integration services for more than 15,000 dealers out of approximately 17,000 franchised dealers nationwide and hundreds of vendors. As a result of Defendants' actions, Authenticom is practically insolvent.[84]

---

[81] *Id.*

[82] *Id.* at ¶ 210.

[83] *Id.* at ¶ 12.

[84] *Id.* at ¶ 13.

## VII.    THE DMS MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

148.    Factors necessary to show that a market is susceptible to collusion are present in this case:  (1) high degree of industry concentration; (2) barriers to entry; (3) demand inelasticity; (4) lack of substitutes; (5) high degree of interchangeability; and (6) absence of competitive sellers.

149.    The DMS market is highly concentrated and dominated by Defendants.

150.    There are significant barriers to entry in the DMS market.  Barriers to entry increase the market's susceptibility to a coordinated effort among the dominant entities in the industry to maintain supra-competitive prices.

151.    The DMS market is an inelastic market. In an inelastic market, an increase in price results in a relatively small decline or no decline in demand for the product despite the price increase, because of the need for the product and the lack of substitutes. DMS is critical for the operation of thousands of dealerships.

152.    Defendants' integration services on their respective systems are not interchangeable substitutes for one another. Among application providers, there is separate demand for integration services on the two systems. Application providers that want to sell their products to dealerships that use the CDK DMS system functionally must purchase data integration services from CDK. The same is true for Reynolds dealerships. If CDK's and Reynolds' integration products were reasonable substitutes, application providers would choose between them. But instead, application providers buy both CDK and Reynolds dealer data integration services.

153.    Due to Defendants' strong-arm tactics, competitors are unable to gain a foothold in the market. As discussed herein, CDK and Reynolds control approximately 75 percent of the

DMS market in the United States when measured using franchised stores, with CDK controlling approximately 45 percent of the market and Reynolds controlling approximately 30 percent. When measured using the number of vehicles sold from franchised dealers, CDK's and Reynolds' combined market share exceeds 90 percent. CDK's and Reynolds' domination of the DMS market in the U.S. has been stable for years. Defendants have maintained supracompetitive pricing for DMS during the Class Period.

## VIII.     CLASS ACTION ALLEGATIONS

154.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this action on behalf of a Class of Direct Purchasers defined as follows:

> All persons or entities that directly purchased DMS from Defendants CDK Global, LLC and The Reynolds and Reynolds Company in the United States and its territories and possessions at any time during the period January 1, 2015 through the present (the "Class Period").
>
> Excluded from the Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

155.    Members of the Class are so numerous that joinder is impracticable.   Plaintiff believes that there are hundreds of Class Members, geographically dispersed throughout the United States such that joinder of all Class Members is impracticable.   Further, the Class is readily identifiable from information and records maintained by Defendants

156.    Plaintiff's claims are typical of the claims of the members of the Class.   Plaintiff's interests are not antagonistic to the claims of the other Class Members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

157.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

158.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

159.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby determining damages with respect to the Class as a whole is appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

160.    The common legal and factual questions, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class member, include, but are not limited to, the following:

(a) Whether Defendants engaged in a contract, combination, or conspiracy to eliminate competition and thereby artificially increase the prices of DMS in the United States;

(b) The duration and extent of the alleged contract, combination, or conspiracy;

(c) Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d) The effect of the contract, combination, or conspiracy on the prices of DMS in the United States during the Class Period;

(e) Whether Defendants' conduct caused supracompetitive prices for DMS;

(f) Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiff and other members of the Class; and

(g) Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

161.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

162.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    INTERSTATE TRADE AND COMMERCE

163.    As described herein, during the Class Period, Defendants, directly or through one or more of their affiliates, sold DMS throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

164.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

165.    Defendants' and their co-conspirators' conduct, including the marketing and sale of DMS has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

166.    The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce as Defendants deprived Plaintiff and Members of the Direct Purchaser Classes of the benefits of free and open competition in the purchase of DMS within the United States.

167.    Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of DMS, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing DMS prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States and on import trade and commerce with foreign nations.

## X.    DEFENDANTS' ANTITRUST VIOLATIONS

168.    Defendants' combination and conspiracy had the following anticompetitive effects in the market for DMS:

(a)  Competition in the market for DMS has been reduced or eliminated;

(b)  Prices for DMS have increased despite the existence of competing providers; and

(c)  U.S. purchasers have been deprived of the benefit of price competition in the market for DMS.

169.    Further, CDK and Reynolds agreed to divide the market, block other data integrators, and seize control over access to dealer data. CDK and Reynolds, horizontal competitors in the DMS market and one-time competitors in the DDI market, coordinated their actions and actively worked together to achieve their goal. By seizing control over access to dealer data, CDK and Reynolds have also been able to illegally tie-in the provision of DDI services to the purchase of DMS. Thereby, imposing massive price increases for their DDI services and obtain monopoly profits. Defendants' conspiracy is a per se violation of the Sherman Act. Defendants' conspiracy is also a violation of the Sherman Act under the rule of reason

170.    The exclusive dealing provisions in Defendants' dealer and vendor contracts are anticompetitive. They are per se illegal because they are part of Defendants' agreement to

eliminate competition. Defendants' exclusive dealing provisions are also anticompetitive and invalid under the rule of reason. Because of CDK's and Reynolds' market share in the DMS Market, at least 75 percent of the nation's dealers are prohibited from using another provider for automated integration services.

171.    Defendants' conduct has harmed the DMS market as a whole. Defendants' conduct has not reduced price, increased output, or improved quality. As described herein, Defendants' anticompetitive conduct has dramatically increased prices, reduced output, restricted customer choice, suppressed innovation, and diminished product quality.

172.    As described herein, During the Class Period, Plaintiff and Class Members directly purchased DMS from Defendants.  As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for DMS than they would have and thus suffered substantial damages.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

173.    Defendants' misconduct reduced competition in the DMS market, reduced choice for purchasers, and caused injury to purchasers.

174.    Defendants' anticompetitive conduct is ongoing, and as a result Plaintiff and the Members of the Direct Purchaser Classes continue to pay supracompetitive prices for DMS.

175.    Because Defendants' unlawful conduct has successfully eliminated competition in the DMS market, and Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificially-inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

## XI.        CLAIMS FOR RELIEF

## COUNT 1 - VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
## DMS MARKET

176.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

177.    Defendants entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

178.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

179.    Defendants' anticompetitive acts were intentional, were directed at the sales of DMS in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing DMS prices throughout the United States.

180.    In formulating and effectuating their combination or conspiracy, Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of DMS including agreeing to coordinate and manipulate the prices of DMS in a manner that deprived purchasers in the U.S. of price competition and providing pretextual justifications to purchasers and the public to explain any raises, maintenance or stabilization of the prices for DMS.

181.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

> a.    Prices charged to, and paid by, Plaintiff for DMS were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b.  Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the sale of DMS in the United States market; and

c.  Competition in establishing the prices paid for DMS was unlawfully restrained, suppressed, or eliminated.

182.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

183.    As set forth above, in violation of Section 1 of the Sherman Antitrust Act, Defendants entered into agreements with one another on the pricing of DMS in the U.S.  This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

184.    Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

185.    The conspiracy had its intended effect, as Defendants benefited from their collusion and the elimination of competition, both of which artificially inflated the prices of DMS as described herein.

186.    As a result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they have paid more for DMS than they otherwise would have paid in the absence of Defendants' unlawful conduct.  The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

187.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

### COUNT 2 - VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR THE IMPOSITION OF EXCLUSIVE DEALING PROVISIONS

188.        Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

189.    CDK and Reynolds entered into contracts with Dealers and Vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

190.    Pursuant to their conspiracy to eliminate competition in the DDI services market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with Dealers and Vendors. The contracts with Dealers provide that Dealers cannot provide access to their Data to any data integrator except CDK or Reynolds, respectively. Likewise, the contracts with Vendors provide that Vendors cannot obtain data for Dealers using the CDK or Reynolds DMS from any data integrator except CDK or Reynolds, respectively. These provisions are standard throughout Defendants' contracts with Dealers and Vendors.

191.    CDK and Reynolds were able to impose these exclusive dealing provisions on Dealers and Vendors as a result of their market power in the DMS Market (Dealers) and the DDI services market (Vendors).

192.    Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the DDI services market they are per se illegal.

193.    These exclusive dealing provisions have caused actual injury to competition in the DMS market and the DDI services market.

194.    Defendants' exclusive dealing agreements do not enhance efficiency or competition in the DMS or DDI services markets. On the contrary, the agreements have produced only anticompetitive effects in both markets.

195.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business or property.

196.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

197.    Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to impose unlawful exclusive dealing provisions in the future, and the Court remedies the conditions Defendants created in the DMS and DDI services markets. Otherwise, Plaintiff and the Class will continue to pay more for DMS and DDI services than they would have in the absence of the conspiracy.

## COUNT 3 - VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 DDI SERVICES MARKET (ILLEGAL TYING)

198.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

199.    Defendants have also imposed tying arrangements on Dealers that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

200.    Defendants have tied Dealer's use of Defendants' integration services to their DMS services, rather than Defendants' competitors' integration services.

201.    The DMS product is separate and distinct from DDI services.

202.    Defendants have sufficient economic power in the market for DMS to coerce and impose significant restrictions in the DDI services market. Defendants have demonstrated their

ability to leverage their market power in the DMS market to control prices and exclude competition in the tied DDI services market.

203.    Defendants tying arrangements affect a substantial amount of interstate commerce.

204.    Defendants' tying arrangements are a per se violation of the federal antitrust laws.

205.    As a result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they have paid more for DDI services than they otherwise would have paid in the absence of Defendants' unlawful conduct.   The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

206.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

**COUNT 4 - VIOLATION OF SECTION 2 OF THE SHERMAN ACT FOR MONOPOLIZATION OF THE DMS AND DATA INTEGRATION SERVICE MARKETS**

207.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

208.    CDK and Reynolds have unlawfully monopolized the DDI services Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

209.    In the primary DMS product market, Defendants have a longstanding duopoly. When Dealers purchase Defendants' brand of DMS, they are "locked in" to that brand through a long-term contractual relationship and the significant financial costs and time associated with implementing a new alternative system.

210.    Because of customer lock-in in the primary DMS market, Defendants have monopolized the markets for DDI services on their respective DMS platforms. CDK and Reynolds have demonstrated their ability to control prices and exclude competition by blocking third-party integrators from accessing Dealer data stored on their systems and by profitably raising integration fees to supra-competitive levels.

211.    CDK and Reynolds used anti-competitive means to acquire and maintain their monopolies in the market for Dealer Data Integration Services, including, *inter alia*, by blocking and disabling third-party integrators from accessing Dealer data, entering into a market division agreement pursuant to which they agreed not to compete in the aftermarkets, and imposing anticompetitive exclusive dealing arrangements on Vendors and Dealers.

212.    Defendants' ability to exclude competition and impose massive price increases demonstrates their market power in the market. And such conduct has no procompetitive business justification.

213.    As a direct and proximate result of Defendants' unlawful use of their duopoly power, Plaintiff and the Class Members have suffered injury to their business or property.

214.    Plaintiff and the Class Members are entitled to treble damages for the violations of the Sherman Act alleged herein.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members pray for relief as set forth below:

A.    Certification of the Direct Purchaser Class pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative for the Direct Purchaser Class and its counsel of record as Class Counsel for the Direct Purchaser Class;

B.    Permanent injunctive relief that enjoins Defendants from violating the antitrust laws and requires them to take affirmative steps to dissipate the effects of the violations;

C.      That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

D.      That acts alleged herein be adjudged and decreed to be illegal tying in violation of the Sherman Act, 15 U.S.C. § 1;

E.      That Defendants acts herein be adjudged and decreed unlawfully monopolization of the DMS and DDI service Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

F.      A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Direct Purchaser Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

G.      By awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

H.      The costs of this suit, including reasonable attorney fees; and

I.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

DATED:  November 14, 2017.                    Respectfully submitted,


                                        *s/Shawn M. Raiter*
                                        Shawn M. Raiter
                                        Wisconsin Attorney ID #1022977
                                        Minnesota Attorney ID #240424
                                        LARSON • KING, LLP
                                        30 East Seventh Street
                                        Saint Paul, Minnesota  55101
                                        (651) 312-6518
                                        sraiter@larsonking.com

Michael L. Roberts
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
(501) 821-5575
mikeroberts@robertslawfirm.us

Phil Elbert
Charles Barrett
Ben Aaron
NEAL & HARWELL, PLC
1201 Demonbreun St.
Suite 1000
Nashville, Tennessee 37203
(615) 244-1713
pelbert@nealharwell.com
cbarrett@nealharwell.com
baaron@nealharwell.com